COMMERCIAL STATE BANK OF INDEPENDENCE, Plaintiff, v. E. E. BROADHEAD, Appellee; J. W. AULT, Appellant.

No. 40665.

MARCH 10, 1931.

REHEARING DENIED JUNE 20, 1931.

Vernon W. Lynch, for appellant.

Molloy & Smith, for appellees.

EVANS, J.—The title of this case is somewhat misleading. The Commercial State Bank has no interest in this appeal. This proceeding was instituted by one Fleckenstein, who was a sub-contractor under Ault, for certain road improvements in Buchanan County. Among the defendants named in the proceeding were Ault, the principal contractor and Broadhead, another sub-contractor. Broadhead filed a cross-petition against Ault upon a claim in which Fleckenstein had no interest. Pending the proceeding Fleckenstein assigned his cause of action to the Commercial State Bank as his creditor. Such cause of action was later compromised. The only controversy left in the proceeding is that involved in the cross-action of Broadhead against Ault. It will be more convenient therefore to refer to Broadhead as the plaintiff and to Ault as the defendant, in the course of the discussion.

At a public letting by the Highway Commission in the year 1928 Ault became the successful bidder for a section of highway in Buchanan County, known in the record as Project P-548B. Thereafter Ault sub-let to Hughes (known also as Hughes Construction Company) the grading on a part of this project. Hughes immediately put his outfit upon the job and continued thereon until late in the Fall and early Winter. In the Fall Broadhead solicited Ault for a job of grading on a part of this project. Ault advised him that he had sub-let the grading job applied for to Hughes and suggested to him to apply to Hughes. He did so apply. The result of this inter-

view was that he was told to apply to Hughes in the Spring. Hughes was hoping to complete his contract before the close of the 1928 season. If he failed to accomplish that he would be ready to negotiate with Broadhead. No contract was entered into in 1928. A contract was entered into in 1929. The first dispute in the case is with whom did the plaintiff enter into contract. The further dispute is what were the terms of such contract. The plaintiff contends that he entered into contract with Ault. This is denied by Ault and the evidence in his behalf shows that plaintiff's contract was with Hughes and not with Ault.

The two disputed questions are so blended in the evidence that they can not conveniently be discussed separately. In his pleadings, the plaintiff, Broadhead, has taken the position that his contract was with Ault and not with Hughes and that such contract made no provision for compensation or the basis thereof. He predicated his prayer for recovery upon a *quantum meruit* and recovered accordingly. This contention was vigorously contested by Ault, as a party and witness, and by Hughes as a witness. The evidence of Ault and Hughes tends to show that immediately after obtaining the principal contract in 1928 Ault had sublet the grading on this project to Hughes and that Hughes put his outfit to work thereon and continued thereon until after December 15; that the contract of Hughes provided for a compensation of 25 cents per cubic yard; that upon the solicitation of Broadhead, Hughes contracted with him for the unfinished part of the job at the same rate of compensation. Broadhead, after finishing the work, filed with the Highway Commission a statement of his account predicated upon time spent in the work and its reasonable value. Upon such basis the plaintiff's first statement presented a claim of $4221.00. This claim was revised down to the sum of $3441.00. The actual yardage of dirt handled was 3727 yards. Hughes, as sub-contractor under Ault, was entitled to recover for this work only $.25 per cubic yard. The claim presented by the plaintiff calls for more than $.90 per cubic yard. Because the plaintiff claims something for a subsequent conversation had after the original negotiations were completed and while the plaintiff was in course of performing the contract, we give our first attention

to evidence of the negotiations which preceded the entry of plain-tiff upon the work.

Plaintiff, Broadhead, testified as follows:

"Q. With whom did you have your work or agreement? A. Mainly with Mr. Ault. Q. When did you first talk to Mr. Ault relative to doing this work? A. In the fall when he pulled out. He says, 'I would like to have somebody go back and do this work', and he say, 'Will you go?' and I says, 'Yes', and he says, 'I will give you 25 cents a yard', and I says, 'I will see', and that is all I said, and he says, 'Let me know in the spring', and I just happened over here that day. The next time that I saw Mr. Ault was in March of 1929. I just happened to meet him in Independence. Q. What did he say and what did you say at that time? A. He said, 'I got a lot of work I wish you would get out and finish up', and I says, 'How about that bridge' and he says 'Hughes has that', and he says, 'Get in touch with him and just as soon as the weather gets good, let me know', and he says, 'I want it done right away and there is a lot of work for you to do', and I says, 'All right', and I let him know. Q. After that, did you get in touch with Mr. Hughes? A. I did. Q. Regarding this bridge work? A. The bridge filling. I told him I would fill that bridge. Q. What did you tell him you would fill it for? A. I told him that I would do it by the yard or day. Q. What did he say? A. He says, 'Whatever Ault says, go on and do.' Q. Did you go out there and work on that bridge? A. I did. Q. Now, Mr. Broadhead, after your conversation with Mr. Hughes that you just stated, where he said—or where you said you would do it either by the yard or the day, and he told you whatever you agreed with Mr. Ault would be all right with him, or words to that effect—after that did you have any conversation with Mr. Ault before you went to work on this job? A. No, I did not."

The foregoing is substantially all of the testimony of the plaintiff in relation to his negotiations preceding his entry upon the work. From the testimony of Hughes it appears that in the Fall of 1928 the plaintiff applied to him for a job to be performed in the following spring. Hughes suggested that he write to him on the subject in the early Spring, and this closed

the interview. In April the plaintiff wrote to Hughes accordingly and Hughes wrote him a letter in reply. Hughes testified as follows:

"I met Mr. Broadhead the next day, and he also informed me that he would like to do some work for me in the spring. I told him that if we did not finish off in the fall of 1928 that he could finish and blade up some borrow pits and things of that kind the following spring. I wrote a letter in the month of April, 1929, to Mr. E. E. Broadhead, which is the letter Mr. Broadhead spoke about receiving in his testimony, and which letter Mr. Broadhead did not have. I do not have a copy of that letter. I received a letter along in April from Mr. Broadhead, which remained at my home until I returned from the south. I had not opened my office yet, so I sat down and answered his letter. Mr. Broadhead asked me in his letter if I had any work that he could do with relation to what we had talked about the fall before, and I told him in my reply that he could go ahead and work everything from the cross road up to the bridge north of the cross road and north of the bridge, filling in the bridge and everything up to and including the first fill on the other side of Sprague's farm, that *I would pay him 25c per cu. yd. for that work* and that I would be up later and arrange for him to do some work on finishing up the borrow pits that was not done the fall before."

Before Hughes had testified as above, the plaintiff had testified concerning the letter referred to, as follows:

"Q. If you received no word from Mr. Hughes or no letter and hadn't seen him personally, how did you know where to go to work out there? A. The letter was before I started to work. Q. He did mail you a letter, didn't he? A. Yes. Q. And it was in April wasn't it? A. It must have been, yes. Q. Before you went to work on the job? A. Yes it was. Q. Do you have that letter, Mr. Broadhead? A. It is here."

It appears without dispute that upon receipt of that letter from Hughes, Broadhead put his outfit upon the job and went to work. Though Hughes testified to the contents of the letter, yet the letter itself was in the possession of the plaintiff and no attempt was made to contradict the testimony by production

of the letter. On this state of fact the letter itself constituted a contract for the rate of pay at $.25 per yard.

However, it is the contention of the plaintiff that after he had been upon the work for two or more weeks, both Ault and Hughes came upon the ground while he was working there. Concerning this occasion the plaintiff testified as follows:

"Q. Well, when did you next see Mr. Ault? A. I think it was around—it was the second week in May after I got out. I think it was about the 15th, and Mr. Hughes and Mr. Ault came out there and I was up to the camp and he says, 'You are busy?' and I says, 'Yes,' and he says, 'I am going up to Andy Fleckenstein's and I will be back soon,' and they came back in the afternoon and I says, 'This cannot be done by the yard.' Q. What were you talking about? A. They wanted to know what I would do this for. Q. Do what? A. Do this grading. Q. Around the bridge or where? A. No, beyond the bridge, but I says, 'I will fill the bridge by the yard, but I will not do the other' and they stepped on the car and went away and they said, 'We will see you again.' Q. Did they ever see you again? A. Mr. Ault came over one day and wanted to know how things was, and wanted to know if I had seen Mr. Hughes, and I says, 'No, I am not going to do this by the yard. I will finish the bridge by the yard, but I will not do the other by the yard, but I will do it by the day—I quit here.' 'Well,' Mr. Ault says, 'Go on and do whatever Mr. Wilch says.' Mr. Wilch was there and he said, 'It will be satisfactory to me, I will see that you get your pay.' Q. And after that you proceeded to do the work beyond the bridge? A. Yes, sir. Q. Did you ever have any other conversation after that with Mr. Ault? A. No, I never saw him. Q. Or with Mr. Hughes? A. No, I never saw him, only the letters that they wrote back. Q. And you went on and completed the work? A. Yes, sir. Q. Now you stated that you would fill this bridge on the yardage basis. You told, I believe, Mr. Hughes that? A. Yes, sir. Q. But I believe you stated that there was no final agreement as to how you would do it either on the yardage or day basis? A. Yes. Q. In your statement you filed with the Highway Commission you include the work that you had done around this bridge? A. Yes, sir. Q. And also all the other work? A. All the work that was done."

694

It will be noted from the foregoing that Hughes did not agree to any modification of the existing contract. It is claimed, however, that Ault came back and said, "Go on and do whatever Mr. Wilch says. I will see that you get your pay." Wilch was the resident engineer of the Highway Commission. The plaintiff testified that he proceeded according to the directions of Wilch. Ault denies that any conversation of the kind occurred. Wilch testified that nothing of the kind occurred to his knowledge, although the plaintiff testified that Wilch was present. Wilch sustained no other relation to the transaction than his official relation as engineer. Ault assumed no other relation to the transaction than that which legally rested upon him as the principal contractor. He had contracted the job to Hughes, and Hughes spent a Summer upon it. The plaintiff concedes that he knew that Hughes had the contract. Ault looked to Hughes for performance. It further appears that the plaintiff filed his claim with the Highway Commission under the provisions of the statute. He stated under oath therein that he performed such labor under contract with the Hughes Construction Company. The claim that his contract was with Ault was first made in an amendment to his cross-petition pending the action. We have read his evidence with great care. It involves much inconsistency and improbability. In view of the fact that he entered upon the work pursuant to the letter of April, 1929, and that this letter contained a proviso for compensation at the rate of $.25 a yard, his entry upon the work did in legal effect constitute an acceptance of the terms of the letter. This fixed the rate of his compensation. It likewise determined that his contract was with Hughes and not with Ault. In so far as he relies upon future changes, if any, in the contract, the burden upon him was to prove such change. His own testimony shows that he never saw Hughes but once thereafter and that Hughes did not agree to the change. The plaintiff had not bound himself to any specified quantity of work. He had a right therefore to quit. But as long as he chose to continue the work upon which he had entered, he had no right to change the basis or rate of compensation. At no time had Hughes agreed that he might enter upon the work except upon an agreed rate of compensation.

Though the plaintiff testified that he did agree to do

a part of the work nearest the bridge for $.25 a yard, yet in his statement of his claim, as filed, and as litigated, he did not recognize his obligation in that regard to any extent. He ignored the yardage *in toto* and claimed on a basis of *quantum meruit* for all his work. His own testimony repudiates his cause of action in that form. The evidence of the engineer shows that the yardage moved by the plaintiff was 3727 cubic yards. As against Hughes he would be entitled to $.25 a yard therefor. Hughes testified that the plaintiff was entitled to receive from him further sums as compensation for blading work upon the borrow pits and other specified matters which had been agreed upon at specific prices and that the amount due the plaintiff by reason of such items would enhance his claim to $1269.00. Of this sum the plaintiff had received $1000.00. The items thus testified to by Hughes were in no manner disputed by the plaintiff. The plaintiff therefore would be entitled to recover out of whatever fund is due Hughes, the sum of $269.00. He has not made Hughes a party to the proceeding. We are in some quandary as to how far his claim against Hughes can be enforced *in rem* against the fund. In view of the testimony of Hughes, as a witness, and of his admitted liability to the extent here stated, we are disposed, in the absence of objection, to award to the plaintiff a judgment *in rem* for $269.00, and interest, against the fund which is due to Hughes as sub-contractor, from the Highway Commission. If there be objection to this form of the final order, such objection may be presented for our consideration by either party by formal motion.

The plaintiff is not entitled to a personal judgment against Ault, nor to costs as against Ault, inasmuch as his contract was not with Ault. Nor can he recover costs against Hughes, because Hughes was not a party to the proceeding.

The decree of the district court is accordingly modified and affirmed.

FAVILLE, C. J., and MORLING, KINDIG, and GRIMM, JJ., concur.